# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TARIK DEBRONTE SCOTT,

        Defendant-Appellant.

UNPUBLISHED
August 23, 2016

No. 323886
Jackson Circuit Court
LC No. 13-004975-FC

AFTER REMAND

Before: SHAPIRO, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM.

Defendant, Tarik Debronte Scott, appeals as of right his convictions, following a jury trial, of attempted murder, MCL 750.91, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Scott to serve consecutive terms of 17 to 30 years' imprisonment for his attempted murder conviction and two years' imprisonment for his felony-firearm conviction. This Court previously remanded for a hearing on newly discovered evidence regarding a previously unavailable witness's recantation testimony. *People v Scott*, unpublished order of the Court of Appeals, January 26, 2016 (Docket No. 323886). We now affirm.

## I. BACKGROUND FACTS

### A. PRETRIAL PROCEEDINGS

On September 6, 2013, a minor was shot in the back after a high school football game. At a preliminary examination, the victim's 14-year-old friend testified that Scott was the shooter. The witness testified that on the day of the shooting, two gangs had an argument. She left the football game a few minutes before it ended, and she noticed that members of a rival gang had also left. As the witness and her friend crossed the street, members of the gang came out of an alley and began an argument.

According to the witness, during the argument, Scott said "I'm going to air this b**** out" and started shooting into the crowd. When she heard the shots, she looked toward them and saw fire coming from Scott's hand. She dropped to the ground next to the victim. During cross-

-1-

examination, the witness admitted that she had several prior arrests, including for felonious assault, malicious destruction of property, disturbing the peace, retail fraud, and breaking and entering. The witness also admitted that she left a residential treatment program and had been detained at a group home.

Detective Holly Rose served the witness with a subpoena through her school liaison officer. Detective Rose received the impression that the witness was willing to testify at trial. However, the prosecutor stated that subsequent attempts to contact the witness, including leaving her mother several messages a day, were unsuccessful.

Before the trial was scheduled to begin, the prosecution requested an adjournment to determine whether the witness would be available to testify. The prosecutor stated that the witness's mother had moved the witness to Colorado and expressed concern that the mother would not make the witness available to testify. The prosecutor served a subpoena on the witness's mother and telephoned several times to make travel arrangements but received no reply.

The prosecutor requested to use the witness's pretrial examination testimony during trial. Defense counsel argued that the prosecution had not used due diligence to attempt to secure the witness and that Scott would be prejudiced if the jury could not assess the witness's credibility. The judge reserved a ruling while further attempts were made, including that the judge personally called the witness's mother and threatened to hold her in contempt of court if the witness did not appear.

The prosecutor's office manager, Sierre Howard, testified that she began making numerous calls to the witness's mother in April 2014. According to Howard, she received a voicemail on May 29, 2014, from a sheriff's office in Colorado confirming that they had served the subpoena on the witness's mother. The trial court found that the prosecution had acted "probably above and beyond" to secure the witness's presence and allowed the witness's preliminary examination testimony to be read at trial.

## B. TRIAL TESTIMONY

At trial, the victim testified that her friends belonged to a gang. Following a high school football game, a rival gang confronted her friends. She identified Scott as one of the members of the rival gang. During an argument between two boys, the victim heard gunshots and started running. The victim ran through some houses to a store and only later noticed that blood was running down her neck. The victim did not see who shot her. Following the victim's testimony, the 14-year-old witness's preliminary examination testimony was read to the jury.

Scott's friend testified that he was present at the shooting but Scott was not present. Scott's cousin testified that he and Scott were not members of a gang and Scott left the game early to get something to eat. After about 10 or 15 minutes, they went to a friend's house. They did not ride their bicycles near the area of the shooting.

On rebuttal, Detective Rose testified that Scott's cousin was a member of the rival gang and, during a previous interview, he did not claim to be with Scott on the night of the shooting.

According to Detective Rose, Scott's phone was located in the area of the shooting from 7:50 until after 9:00 p.m., but it was not located in the area of the shooting at the time of the 911 call. It was unknown how much time passed between the shooting and the 911 call, and a person on a bicycle could travel the distance from where Scott's cell phone was after 9:00 p.m. to where it was at 9:25 p.m. in a very brief time. Additionally, Scott called his cousin at 9:25 p.m., a time that they were supposedly together.

## II. USE OF PRELIMINARY EXAMINATION TESTIMONY

### A. CONFRONTATION

Scott contends that the prosecution's use of the 14-year-old witness's preliminary examination testimony violated his right to confront the witnesses against him.

This Court reviews for an abuse of discretion whether the prosecution diligently attempted to secure an unavailable witness. *People v Starr*, 89 Mich App 342, 345; 280 NW2d 519 (1979). The trial court abuses its discretion when its outcome falls outside the principled range of outcomes. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

Both the United States and Michigan constitutions protect a defendant's right to confront the witnesses against him or her. US Const, Am VI; Const 1963, art 1, § 20. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). The improper admission of hearsay may implicate the defendant's constitutional rights. *People v Dendel (On Second Remand)*, 289 Mich App 445, 452-453; 797 NW2d 645 (2010); *Crawford v Washington*, 541 US 36, 50-51; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

However, the trial court does not violate the defendant's right to confrontation by admitting the prior testimony of an unavailable witness if the prosecution made good-faith efforts to obtain the witness's presence at trial and the testimony is sufficiently reliable. *Barber v Page*, 390 US 719, 724-725; 88 S Ct 1318; 20 L Ed 2d 255 (1968); *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). Generally, testimony taken at a preliminary examination is sufficiently reliable. *Id*.; MCL 768.26.

Whether the prosecution made good-faith efforts to secure a witness depends on the circumstances of each case. *Bean*, 457 Mich at 684. The prosecution must inquire of persons who could help them locate the witness, check out specific leads, and attempt to locate witnesses in foreign jurisdictions. See *Bean*, 457 Mich at 689-690. Tardy or incomplete efforts to locate the witness are not sufficiently reasonable. *People v Dye*, 431 Mich 58, 68; 427 NW2d 501 (1988) (opinion by LEVIN, J.).

We conclude that the trial court did not abuse its discretion when it determined that the prosecution engaged in reasonable efforts to secure the unavailable witness. Detective Rose indicated that the witness initially stated that she would testify in the trial. The prosecution served the witness with a subpoena, but the witness failed to respond. Subsequently, the prosecution engaged in frequent telephone contacts to attempt to secure the witness, calling

"sometimes several times a day." After those contacts were not returned, the prosecution sought an adjournment to secure the witness.

The prosecution discovered that the witness was located out of state, and it served a subpoena on the witness's mother. From April 10 to May 27, 2014, the prosecution's assistant left numerous voicemails for the witness's mother. Only after its efforts were unsuccessful did the prosecution move the trial court to allow it to use the witness's preliminary examination testimony. The trial court reserved its ruling, and the judge himself telephoned the witness's mother, threatening to hold her in contempt of court if she did not produce the witness. The mother did not respond.

The prosecution's efforts were not tardy in comparison to the trial date, since it adjourned the trial in order to secure the witness. Additionally, the prosecution's efforts were not incomplete. It subpoenaed the witness, located the witness after the witness left the state, and subpoenaed the witness's mother. Despite these efforts and a contempt threat, the mother still refused to produce the witness. The trial court need only find that the prosecution engaged in reasonable efforts. See *People v Eccles*, 260 Mich App 379, 391; 677 NW2d 76 (2004). We conclude that the trial court's determination that the prosecution engaged in reasonable efforts in this case did not fall outside the range of principled outcomes.

## B. NEWLY DISCOVERED EVIDENCE

Additionally, the recantation evidence did not make it more likely that a different result would have occurred on retrial. The trial court may grant a new trial on the basis of newly discovered evidence when (1) the evidence itself, not merely its materiality, is newly discovered, (2) the evidence is not cumulative, (3) the evidence is likely to render a different result probable on retrial, and (4) the defendant could not have produced the evidence at trial. *People v Canter*, 197 Mich App 550, 559; 496 NW2d 336 (1992). Recantation testimony "is traditionally regarded as suspect and untrustworthy." *Id*. Whether to grant a new trial on the basis of recantation testimony is subject to the trial court's discretion. *Id*. at 560. This Court must give regard to the trial court's superior ability to consider the credibility of the recanting witness. *Id*.

This Court remanded for the trial court to consider whether a telephone conversation after trial between the witness and Scott's mother, in which the witnesses recanted her pretrial examination testimony, was newly discovered evidence.[1] Following remand, the trial court issued an opinion in which it concluded that the conversation between the witness and Scott's mother was newly discovered evidence but it would not render a different result probable on retrial. The trial court found that the witness's recantation testimony

> is highly suspect and without much weight. She gives no explanation for her sudden about-face and it appears highly likely that she is changing her story in response to multiple threats from Defendant's associates urging her to recant. As

---

[1] *People v Scott*, unpublished order of the Court of Appeals, January 26, 2016 (Docket No. 323886).

-4-

this Court thus finds that the testimony is not credible and does not make a new result probable at retrial, Defendant's motion for a New Trial is DENIED.

We conclude that the trial court's decision did not fall outside the range of principled outcomes. The witness testified that her memory was not better at the time of the time of the evidentiary hearing than at the time of the preliminary examination, and that what she said at the preliminary examination was not knowingly false. She testified that individuals within the community threatened her if she testified. Given the opportunity to view the witness's demeanor at the evidentiary hearing, the trial court found that her recantation was influenced by something other than an honest belief that her initial identification of Scott was mistaken.

## III. GREAT WEIGHT OF THE EVIDENCE

Scott also contends that his verdict was against the great weight of the evidence. Specifically, Scott contends that the vast majority of the evidence conflicted with the testimony of the sole witness who placed him at the scene, and that the witness's testimony was so thoroughly impeached that it had no probative value. We disagree.

The prosecution has the constitutionally based burden to prove each element of an offense beyond a reasonable doubt. *People v Ericksen*, 288 Mich App 192, 196; 793 NW2d 120 (2010). Generally, courts review a defendant's claim that the jury's verdict was against the great weight of the evidence to determine whether "the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009).

Conflicting testimony alone does not provide a sufficient ground to discard a verdict as against the great weight of the evidence. *Id*. at 469-470. This Court does not resolve credibility questions on appeal. *Id*. at 469. We must defer to the trier of fact's credibility determinations unless directly contradictory testimony was so far impeached that it was deprived of all probative value that it was unbelievable, or testimony contradicted physical facts or defied physical realities. *People v Lemmon*, 456 Mich 625, 643-644; 576 NW2d 129 (1998).

In this case, there was extensive testimony that rival gangs had a confrontation at the football game immediately preceding the shooting. While Scott's friend and cousin testified that he was not present at the scene, both the victim and the 14-year-old witness testified that Scott was present. The witness also testified that Scott was the one who shot into the crowd. While the witness was allegedly a member of one of the gangs and had an extensive criminal history for her age, her testimony did not contradict physical facts, and it was not so far impeached that it had no probative value.

The victim and witness both placed Scott at the scene of the shooting. Additionally, Scott called his cousin on the telephone even though they were allegedly together in a different location at the time. While Scott's phone was no longer in the area at the time of the 911 call, the call occurred sometime after the shooting, and it would only have taken Scott a short time to travel between the locations. We conclude that the evidence does not preponderate so heavily in the opposite direction that it would be a miscarriage of justice to allow the verdict to stand.

We affirm.

/s/ Douglas B. Shapiro
/s/ Peter D. O'Connell
/s/ Stephen L. Borrello